IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| BERNARDO GONZALEZ,<br><br>    Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE, Commissioner of the Social Security Administration,<br><br>    Defendant. | Civil No. 07-1813 (FAB/BJM) |

**OPINION AND ORDER**

Plaintiff Bernardo Gonzalez ("Gonzalez") filed a complaint seeking judicial review of the decision of the defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"), that Gonzalez was not disabled prior to November 10, 2002, under Sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423.[1] (Docket No. 1). Specifically, Gonzalez asks for judgment reversing the determination of the Commissioner, or, in the alternative, vacating the Commissioner's decision and remanding the matter for further proceedings. (Docket No. 15, p. 29). The Commissioner answered the complaint and filed a memorandum of law in support of the Commissioner's decision. (Docket No. 11). Gonzalez also filed a memorandum of law in support his position. (Docket No. 15). The parties have agreed to have the case heard before me. (Docket No. 10, 12). After careful review of the administrative record and the briefs on file, the Commissioner's decision is affirmed.

**LEGAL STANDARD**

The court's review is limited to determining whether the Administrative Law Judge ("ALJ") employed the proper legal standards and found facts upon the proper quantum of evidence.

---

[1] González previously had been awarded a period of disability beginning November 10, 2002. (Transcript "Tr."20). The present proceeding concerns González's attempt to move forward the onset date of disability to November 9, 2001.

Manso-Pizarro v. Secretary of Health and Human Servs., 76 F.3d 15, 16 (1st Cir.1996). The ALJ's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir.1999); Da Rosa v. Secretary of Health and Human Servs., 803 F.2d 24, 26 (1st Cir.1986); Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir.1991). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagán v. Secretary of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). The burden is on the claimant to prove that he is disabled within the meaning of the Social Security Act ("Act"). See Bowen v. Yuckert, 482 U.S. 137, 146-47, n.5 (1987). A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[2] 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

A five-step sequential evaluation process must be applied to every case in making a final determination as to whether a claimant is disabled. 20 C.F.R. §404.1520; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987); Goodermote v. Secretary of Health and Human Servs., 690 F.2d 5, 6-7 (1st Cir.1982). In step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity." If he is, disability benefits are denied. 20 C.F.R. § 404.1520(b). If

---

[2]The phrase "work which exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §423(d)(2)(A).

he is not, the Administrative Law Judge proceeds to step two, through which it is determined whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. However, if the impairment or combination of impairments is severe, the evaluation proceeds to the third step, in which it is determined whether the claimant has an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, through which the ALJ determines whether the impairment prevents the claimant from performing the work he has performed in the past. If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If it is determined that the claimant cannot perform this work, then the fifth and final step of the process calls for a determination of whether the claimant is able to perform other work in the national economy in view of the residual functional capacity, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

The claimant has the burden, under steps one through four, of proving that he cannot return to his former employment because of the alleged disability. Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 5 (1st Cir.1991). Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden, under step five, to prove the existence of other jobs in the national economy that the claimant can perform. Ortiz v. Secretary of Health and Human Servs., 890 F.2d 520, 524 (1st Cir. 1989).

## FACTUAL AND PROCEDURAL BACKGROUND

Gonzalez has a fifth grade education and worked as a cook and clean-up worker. (Tr. 97, 99, 106, 110, 130, 131). He claims to have been disabled since November 9, 2001 – at age sixty – due

to major depression, arthritis, memory loss, glaucoma, and insomnia. (Tr. 75, 87, 104, 107).

On October 18, 2001, while still working, Gonzalez was seen at the Behavioral Health Center of the West for complaints of anxiety, visual and audio hallucinations, and inability to sleep. (Tr. 192-193). At this appointment, he denied suffering from suicidal or homicidal ideation. (Tr. 193). Gonzalez was diagnosed with major depressive disorder with psychosis and a Global Assessment of Functioning ("GAF") score of 60,[3] and was prescribed Celexa, Xanax, and Stelazine. (Tr. 192-194). On November 9, Gonzalez stopped working on account of his anxiety disorder and the pain in his back and feet. (Tr. 87, 107). On December 20, Gonzalez had a follow-up appointment during which he again complained of difficulty sleeping. (Tr. 192, 194). He was found to be "stable" with treatment. (Tr. 194).

On February 19, 2002, González again was seen at the Behavioral Health Center of the West and stated that the Xanax was more effective than other medications, and that he had tremors on occasion. (Tr. 195-196). On April 8, 2002, González was seen at San Antonio Hospital for complaints of persistent right shoulder pain. (Tr. 198-204). He was diagnosed with arthritis with a good prognosis, and was discharged that same day in stable condition. (Tr. 203). On June 18, 2002, González once again was seen at the Behavioral Health Center of the West for a follow up appointment, during which he was found to be "stable" with treatment and was prescribed the same three medications. (Tr. 195-196).

On September 9, 2002, González was seen at San Antonio Hospital for complaints of chest pain and shortness of breath. (Tr. 183-189). Upon examination, he was found to have chest wall

---

[3] The GAF "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004), quoting Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV-TR") at 32. It "considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Echandy-Caraballo v. Astrue, 2008 WL 910059, *4 n.7 (D.R.I. 2008), quoting DSM-IV-TR at 34 (brackets omitted). A GAF score between 51-60 is indicative of "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Echandy-Caraballo, 2008 WL 910059, *4 n.7, quoting DSM-IV-TR at 34 (brackets omitted).

tenderness. (Tr. 183). On October 29, 2002, González was seen at the Behavioral Health Center of the West where he reported that he had improved as a result of his medication, was sleeping well, and did not suffer from suicidal or homicidal thoughts and did not experience audio or visual hallucinations. (Tr. 195-197). He was instructed to continue the same treatment. (Tr. 197).

On March 13, 2003, González was seen at the emergency room of the Family Health Center for complaints of difficulty sleeping, feelings of going insane, visual hallucinations, depression, and crying episodes. (Tr. 219-224). González was found to be anxious and to have a non-tender abdomen, a non-tender chest wall, and high blood pressure. He was discharged the same day. (Tr. 219-220, 224). On March 17, 2003, the Behavioral Health Medical Center of the West reported that González had been receiving psychotherapy treatment at that facility since January 17, 2003, for a diagnosis of major depressive disorder.[4] (Tr. 248-251).

On May 10, 2003, Dr. Michael Babilonia Román performed a consultative internal medicine and rheumatological evaluation of González, who complained of osteoarthritis, a "nervous condition," arterial hypertension, and pain in his joints. (Tr. 252-275). González was found to have a restriction in the angle movement of the dorsal spine at the lumbosacral region. X-ray images of the chest revealed chronic lung changes, and x-ray images of the cervical spine revealed scoliosis, spondylosis, and degenerative disc disease at levels C5-C6 and C6-C7. In addition, x-ray images of the lumbar spine revealed minimal scoliosis, early spondylosis, and narrowing of the inter-space between levels T12-L1 and L1-L2. (Tr. 257-275). González was diagnosed with osteoarthritis and hypertension. (Tr. 268).

On May 19, 2003, Dr. Alberto Rodriguez Robles performed a consultative psychiatric evaluation of González, who complained of body tremors, depression, a lack of interests and desires, an inability to concentrate, fatigue, pessimistic thoughts, trouble sleeping, and auditory and visual

---

[4]The Behavioral Health Medical Center of the West reported that González had been diagnosed with "296" (Tr. 250), which, according to the DSM-IV, is major depressive disorder. See DSM-IV, at 345; (see also Docket No. 11, p. 6 n.4).

hallucinations. (Tr. 276-290). Upon exam, González appeared to be depressed and anxious, and he had a restricted affect; logical, coherent, and relevant thoughts; self-deprecatory thoughts; ideas of desertion and hopelessness; average intellectual capacity; diminished attention and concentration; and an inability to handle his funds. (Tr. 285-287, 290). González was diagnosed with major depressive disorder with a guarded prognosis. (Tr. 284, 288).

On May 27, 2003, Dr. Idalia Pedroza López, a Disability Determination Services ("DDS") physician, opined that González could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand, walk, and/or sit for six hours in an eight hour workday; push/pull without limitation; frequently climb, balance, kneel, and crawl; and occasionally stoop and crouch. (Tr. 291-293). On June 16, 2003, Dr. Orlando Reboredo, a DDS psychologist, opined that González suffered from an affective disorder that resulted in mild limitations in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. 301, 304, 311). Dr. Reboredo further opined that González had some moderate limitations to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to sustain an ordinary routine without special supervision; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. (Tr. 315-316). On July 22, 2003, Dr. Carlos M. Jusino-Berríos opined "I believe that six months before [May 10, 2003] could be a reasonable [illegible] onset date" for González's disability. (Tr. 319-323).

On October 8, 2003, Dr. José R. Pesquera, a DDS physician, opined that there was no additional medical evidence of record that would allow González's November 9, 2001 alleged onset date to be granted or to find that González became disabled on a date earlier than November 10, 2002. (Tr. 326). Dr. Pesquera further opined that Dr. Pedroza's May 27, 2003 opinion should be adopted. (Tr. 326). On October 9, 2003, Dr. Lillian González, a DDS psychologist, opined that there was no additional medical evidence of record that would allow González's November 9, 2001 alleged onset date to be granted or to find that González became disabled on a date earlier than

November 10, 2002. (Tr. 327). Dr. González further opined that Dr. Reboredo's June 19, 2003 opinion should be adopted. (Tr. 301, 327).

A hearing was held before Administrative Law Judge Raúl Pardo ("ALJ") on September 13, 2005. (Tr. 28-33). At the hearing, González's attorney argued that since González was diagnosed with a major depressive disorder and prescribed the anti-psychotic drugs on October 18, 2001, he was suffering from the disabling mental illness by November 9, 2001. (Tr. 30). He supports this averment by alleging that the illness did not change between November 9, 2001, and November 10, 2002, when he was found to be disabled. Id. González's attorney conceded that his client was given a GAF of 60 in October 2001, but he argued that that designation did not match the symptoms that his client was experiencing at that time, which was "a psychotic condition, a severe depression with psychosis [that made it] difficult for him to have functioned occupationally in the jobs that he had in the past or any others that exist in the national economy." (Tr. 31).

The ALJ issued his ruling on October 5, 2005. (Tr. 20-26). With regard to the five-step evaluation process, the ALJ determined: (1) that González had not engaged in substantial gainful activity since the alleged onset of disability; (2) that his major depressive disorder with psychosis was "severe"; (3) that his impairment did not meet or medically equal one of th listed impairments in Appendix 1 of the regulations; (4) that he was unable to perform any of his past relevant work; but (5) that González had the residual functional capacity to perform substantially all of the full range of medium work. Accordingly, the ALJ determined that González has been disabled since November 10, 2002, but not prior thereto. (Tr. 25-26).

In discussing the medical evidence, the ALJ found that "notwithstanding his depressive symptomatology, the claimant continued to be logical, relevant, coherent and well oriented through November 9, 2002 ... [and his] judgment, memory, thought process and thought content were not significantly impaired." (Tr. 22). The ALJ further found that the medical record established that "as a result of his mental condition, the claimant's daily activities were mildly restricted, he had mild difficulties in maintaining social functioning and mild difficulties maintaining concentration,

**Bernardo González vs. Michael J. Astrue, Commissioner of Social Security**   Page 8
Civil No. 07-1813 (FAB/BJM)

persistence and pace, without episodes of deterioration or decompensation in work and work-like settings." (Tr. 22). The ALJ also noted that "[t]he Medical-Vocational Guidelines are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any nonexertional limitations." (Tr. 24). The ALJ then stated that "[b]ecause the claimant had the exertional capacity to perform substantially all of the requirements of medium work [i.e., ability to lift 25 to 50 pounds] from November 9, 2001 through November 9, 2002, and considering the claimant's age, education, and work experience, a finding of 'not disabled' is supported by application of Medical-Vocational Rule 203.04." (Tr. 24). After concluding that there were jobs existing in significant numbers in the national economy that González was able to perform, the ALJ held that "[t]he claimant has been disabled since November 10, 2002, but not prior thereto." (Tr. 24).

## DISCUSSION

The analysis in this case centers on the ALJ's determination at step five in the sequential evaluation process contained in 20 C.F.R. § 404.1520. At that step, the ALJ used the Medical-Vocational Guidelines ("Grid") as a framework for his determination that González was able to perform work that existed in the national economy. The ALJ's findings with regard to steps one through four are not contested by González. Thus, the sole question before the court is whether the ALJ's decision at step five was based upon substantial evidence.

González argues that the ALJ erred in using the Grid in his determination that González was able to perform work that existed in the national economy since González had non-exertional impairments that could not be taken into account by the Grid. (Docket No. 15, p. 9). It is well established that "[t]he Grid is based on a claimant's exertional capacity and can only be applied when claimant's non-exertional limitations do not significantly impair claimant's ability to perform at a given exertional level." Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994), *citing* Sherwin v. Sec'y of HHS, 685 F.2d 1, 2-3 (1st Cir.1982). But "[t]he existence of a non-exertional impairment does not automatically preclude reliance on the Grid[;] ... [t]he ALJ must determine whether a

**Bernardo González vs. Michael J. Astrue, Commissioner of Social Security**          Page 9
Civil No. 07-1813 (FAB/BJM)

non-exertional limitation is significant enough to limit access to the full range of jobs at [a given exertional level]." Frustaglia v. Sec'y of HHS, 829 F.2d 192, 195 (1st Cir. 1987) (internal citation omitted). "If a non-strength impairment, even though considered significant, has the effect only of reducing that occupational base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability." Ortiz, 890 F.2d at 524.

Regarding mental impairments in particular, exclusive reliance upon the Grid is appropriate so long as the claimant's mental impairment does not "interfere more than marginally with the performance of the full range of unskilled work." Id. at 526. The procedure for evaluating a mental impairment is set forth in 20 C.F.R. § 404.1520a. Under the regulation, the ALJ's decision "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section." 20 C.F.R. § 404.1520a(e)(2). The four functional areas in which the Commissioner must rate each claimant are: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). The regulation also explains when, based on these ratings, a mental impairment may be considered not severe:

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 404.1521).

20 C.F.R. § 404.1520a(d)(1); see also Figueroa-Rodriguez v. Sec'y of HHS, 845 F.2d 370, 372 (1st Cir. 1988).

Here, the ALJ found that, prior to November 10, 2002, "the claimant's daily activities were *mildly* restricted, he had *mild* difficulties in maintaining social functioning and *mild* difficulties maintaining concentration ...." (Tr. 22) (emphasis added). The record, however, contains at least some evidence contrary to these findings. Specifically, González's assignment of a GAF score of

**Bernardo González vs. Michael J. Astrue, Commissioner of Social Security**    Page 10
Civil No. 07-1813 (FAB/BJM)

60 in October 2001 indicates that he suffered "*moderate* symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR *moderate* difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Echandy-Caraballo, 2008 WL 910059, *4 n.7, *quoting* DSM-IV-TR at 34 (brackets omitted, emphasis added). But a closer review of the evidence in the record casts doubt over the accuracy of this assessment. In December 2001 and June 2002, González was found to be "stable" with treatment (Tr. 194-196), and in October 2002, it was observed that González's condition had improved as a result of the medication, he was sleeping well, did not suffer from suicidal or homicidal thoughts, and did not experience audio or visual hallucinations. (Tr. 195-197). González argues that the use of the term "stable" signifies that the condition was unchanged (Docket No. 15, p. 20), but even if that is true, other evidence nonetheless shows that the condition improved up until late October 2002, when it was observed that González was doing better with treatment. Accordingly, the evidence on record supports the finding that González suffered no more than mild impairments in the areas of daily activities, social functioning, and concentration. And there is no indication of any episodes of decompensation; to the contrary, González's condition improved.

In fact, it was not until June 2003 that Dr. Reboredo opined that González suffered from an affective disorder that resulted in "moderate" difficulties in maintaining social functioning and "moderate" difficulties in maintaining concentration, persistence, and pace. (Tr. 301, 304, 311). He further opined that González had some "moderate" limitations to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to sustain an ordinary routine without special supervision; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. (Tr. 315-316). But while this diagnosis provides weighty evidence of González's disability, it does not lend much support to González's argument since it was issued seven months after the disability onset date of November 10, 2002, as determined by the Commissioner. Accordingly, the ALJ's determination that prior to November 10, 2002 González's impairments were not severe enough to interfere with his ability to perform

**Bernardo González vs. Michael J. Astrue, Commissioner of Social Security**                                Page 11
Civil No. 07-1813 (FAB/BJM)

medium work is supported by substantial evidence, and the ALJ's application of the Grid was therefore proper. (See Tr. 22); 20 C.F.R. §404.1520a(c)(3) and (e)(2).

But even if the ALJ would have been precluded from applying the Grid directly in this case, he nonetheless would have been authorized to use it as a "framework" for his decision without needing to rely on a vocational expert. "[S]o long as a nonexertional impairment is justifiably found to be substantially consistent with the performance of the full range of unskilled work, the Grid retains its relevance and the need for vocational testimony is obviated." Ortiz, 890 F.2d at 526. This determination involves the following two lines of inquiry: "1) whether a claimant can perform close to the full range of unskilled work, and 2) whether he can conform to the demands of a work setting, regardless of the skill level involved." Id. The Commissioner has described the mental demands of unskilled work as follows: "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Titles II and XVI: Capability to do Other Work – Themedical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments*, SSR 85-15, 1985 WL 56857, at *4.

The ALJ relied on the residual functional capacity determination by Dr. Pedroza in order to find that González could perform the physical component of medium work – i.e., lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand, walk, and/or sit for six hours in an eight hour workday; push/pull without limitation; frequently climb, balance, kneel, and crawl; and occasionally stoop and crouch. (Tr. 291-293). In addition, the ALJ determined that, "prior to November 10, 2002, there was no evidence of major disturbances in the thought process and content, major memory, attention or concentration deficits, or disturbances of perception. The claimant's impairments were not significant, as suggested by the longitudinal analysis of the medical evidence on the whole record conducted by the psychiatrists from Disability Determination Services." (Tr. 22). The ALJ then reiterated that González, during that time, "continued to be logical, relevant, coherent and well oriented," and that his "judgment, memory, thought process and thought content

were not significantly impaired." (Tr. 22).

González avers that this finding lacks substantial evidence because the ALJ improperly relied on the medical opinions in the record of doctors who did not personally examine him. (Docket No. 15, p. 11). To support his position, González cites to Berríos López v. Secretary of Health and Human Servs., 951 F.2d 427 (1st Cir. 1991). That case, however, stands for the proposition that non-examining doctors' opinions *can* constitute substantial evidence regarding alleged disability. In Berríos López, the ALJ relied exclusively upon reports from two non-testifying, non-examining physicians to reach his conclusions regarding the claimant's exertional residual functional capacity. The court stated that "[s]uch reports often contain little more than brief conclusory statements or the mere checking of boxes denoting levels of residual functional capacity, and accordingly are entitled to relatively little weight. Here, by contrast, Dr. Sanchez at least briefly mentions all of claimant's alleged impairments and states medical conclusions as to each." Id. at 931. As a result, the court concluded, "his report suggests that Dr. Sanchez did review the medical file with some care." Id. Additionally, the court gave weight to the fact that both doctors' reports were prepared at a time when the doctors would have had most, although not all, of the medical evidence available for their review. Id. As a result, the court found that the doctors' opinions constituted "substantial evidence."

In this case, Dr. Reboredo, one of the DDS physicians, like Dr. Sánchez in Berríos López, went beyond merely checking boxes and wrote out González's alleged impairments and his own conclusions regarding González's abilities in light of those impairments. (Tr. 317). Thus, Dr. Reboredo's report suggests that he reviewed the medical file with some care. In addition, the timing of Dr. Reboredo's and Dr. Pedroza's reports – June 16, 2003, and May 27, 2003, respectively – indicate that both doctors had most, if not all, of the relevant medical record before them at the time of their evaluations.

The record also contains support for placing the disability date no sooner than November 10, 2002. First, Dr. Jusino-Berríos's July 22, 2003 letter stated that he believed that "six months before [May 10, 2003] could be a reasonable [illegible] onset date" for González's disability. (Tr.

319-323). Second, the doctor's report from October 29, 2002 stated that González's condition had improved with his medications and that he was sleeping better. (Tr. 195-197). And third, two physicians' statements in the record indicate that no additional medical evidence has entered the record since the reports were entered by doctors Reboredo and Pedroza that would alter those doctors' opinions or justify granting an earlier onset date. (Tr. 326-327).

On balance, although the record contains some evidence to support González's averment, the ALJ's decision that González was not disabled from November 9, 2001 to November 9, 2002 is supported by substantial evidence. In Ortiz, a case similar to this one, the First Circuit determined that the Commissioner was justified in relying exclusively on the Grid despite the existence of a significant nonexertional limitation. There, the evidence weighed more heavily in favor of the claimant; the only two doctors to submit the residual functional capacity form rated the claimant with a "severe" mental impairment. One doctor rated the claimant's impairments in the first three functional categories as "moderate, moderate, and seldom," and a second doctor rated all three at the moderate level. A third doctor submitted a similar form finding moderately severe to severe functional loss. Ortiz, 890 F.2d at 525 n.6. Notwithstanding the existence of these opinions in the record, the First Circuit accepted the Commissioner's finding that the claimant's mental impairment did not significantly affect his ability to perform unskilled work. Id. at 528. Here, by contrast, González can point to no evidence in support of his argument as compelling as that which was found in Ortiz to be insufficient to prevail on the same averment. Instead, the record contains substantial evidence in support of the Commissioner's decision and a modicum of evidence in support of González's position. But although the evidence may arguably have justified a different conclusion, it is not this court's duty to second-guess the Commissioner's determination, see Rodriguez Pagan, 819 F.2d at 3 (the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence"); rather, this court is bound by the determination if it is supported by substantial evidence. Because the Commissioner's decision here is supported by substantial evidence, it is affirmed.

Case 3:07-cv-01813-FAB-BJM   Document 16   Filed 05/01/08   Page 14 of 14

**Bernardo González vs. Michael J. Astrue, Commissioner of Social Security**     Page 14
Civil No. 07-1813 (FAB/BJM)

## CONCLUSION

For the reasons stated above, the Commissioner's decision is **AFFIRMED**. Judgment shall be entered accordingly.

**IT IS SO ORDERED**.

At San Juan, Puerto Rico, on this 1st day of May, 2008.

                                  **S/Bruce J. McGiverin**
                                  BRUCE J. McGIVERIN
                                  United States Magistrate Judge